COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Tel.: (201) 845-9600
Fax:  (201) 845-9423
 *psp@njlawfirm.com*
 *mfg@njlawfirm.com*

HARTLEY LLP
Jason S. Hartley
550 West C Street, Suite 1750
San Diego, CA 92101
Tel.:  (619) 400-5822
Fax:  (619) 400-5832
 *hartley@hartleyllp.com*

*Attorneys for Plaintiffs*

*[Additional Counsel Appear on Signature Page.]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| C.U.E., INC., individually and on behalf of all others similarly situated,<br><br>                                   *Plaintiff,*<br><br>          vs.<br><br>BASF AG; BASF CORP.; BAYER AG; BAYER CORP., COVESTRO AG; COVESTRO LLC; DOWDUPONT INC.; DOW CHEMICAL CO.; HUNTSMAN CORP.; HUNTSMAN INTERNATIONAL LLC.; LANXESS AG, LANXESS CO.; MCNS POLYURETHANES USA INC.; MITSUI CHEMICALS, INC.; MITSUI CHEMICALS AMERICA, INC.; MITSUI CHEMICALS & SKC POLYURETHANES, INC.; WANHUA CHEMICAL GROUP CO., LTD.; WANHUA CHEMICAL (AMERICA) CO. LTD.; WANHUA CHEMICAL US HOLDING, INC.,<br><br>                                   *Defendants.* | Case No.<br><br>**CLASS ACTION COMPLAINT<br>AND JURY DEMAND** |

---

CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiff C.U.E., Inc., located at 11 Leonberg Rd., Cranberry Township., Pennsylvania 16066, individually and on behalf of the proposed Class, by and through its counsel, for its Complaint against defendants BASF AG, BASF Corp., Bayer AG, Bayer Corp., Covestro AG, Covestro LLC, DowDuPont Inc., Dow Chemical Co., Huntsman Corp., Huntsman International LLC, Lanxess AG, Lanxess Co., MCNS Polyurethanes USA, Inc., Mitsui Chemicals, Inc., Mitsui Chemicals America, Inc., Mitsui Chemicals & SKC Polyurethanes, Inc., Wanhua Chemical Group Co., Ltd., Wanhua Chemical (America) Co. Ltd., Wanhua Chemical US Holding, Inc. (collectively "Defendants") hereby state and allege as follows:

## NATURE OF THE ACTION

1.      This class action involves a long-standing conspiracy among Defendants to fix the price of methylene diphenyl diisocyanate ("MDI") and toluene diisocyanate ("TDI"), collectively referred to herein as "Isocyanates."  Isocyanates are chemicals primarily used in the production of polyurethane products.

2.      Defendants are recidivist antitrust violators, who have been the subject of previous criminal and civil cases, including unlawfully conspiring to fix the prices of polyurethanes in the late 1990's and early 2000s.

3.      For many years, beginning as early as 2015 and continuing until at least February 2018, Defendants agreed among themselves to fix the prices of Isocyanates, including by limiting supply through planned manufacturing plant shutdowns.

4.      Defendants' conspiracy is currently the subject of an investigation by the United States Department of Justice ("DOJ").

5.      Defendants' conspiracy unlawfully inflated the price of Isocyanates, causing harm to Plaintiff and Class Members.

6.     Plaintiff brings this action for injunctive relief and to recover treble damages, attorneys' fees, litigation expenses, and court costs, for violations of Sections 1 and 3 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. §§ 1 and 3, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15 and 26.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

8.     Defendants engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

9.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391 (b) and (c) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more Defendants reside, are found, have agents, are licensed to do business, are doing business, or transact business in this District.

10.     This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Isocyanates throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

### A.    Plaintiff

11.     Plaintiff C.U.E., Inc. is a Pennsylvania corporation headquartered at 11 Leonberg Rd., Cranberry Township, Pennsylvania. During the Class Period, C.U.E. purchased Isocyanates directly from one or more defendants, and was injured in its business or property by reason of the antitrust violations alleged in this complaint.

### B.    Defendants

12.     BASF AG is a German corporation headquartered at Carl-Bosch-Str. 38, 67056 Ludwigshafen, Germany.  BASF AG bills itself as "the world's leading chemical company," and had over $74 billion in global sales in 2017.  During the Class Period, BASF AG manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

13.     BASF Corp., is a Delaware corporation headquartered at 100 Park Ave., Florham Park, New Jersey.  BASF Corp. is a wholly-owned subsidiary of BASF AG.  BASF Corp. claims to be the "second largest producer and marketer of chemicals and related products in North America." During the Class Period, BASF Corp. During the Class Period, BASF AG manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

14.     BASF AG and BASF Corp. are jointly referred to herein as "BASF."

15.     Bayer AG is a German corporation with its principal place of business at Werk Leverkusen, 51368 Leverkusen, Germany.   Bayer AG, in total sales between itself and its subsidiaries, had North American sales of over $11 billion in 2017.  During the Class Period, Bayer AG manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

16.     Bayer Corp. is a Delaware corporation with its principal place of business at 100 Bayer Blvd., Whippany, New Jersey.  Bayer Corp. is a wholly-owned subsidiary of Defendant Bayer AG.  During the Class Period, Bayer AG manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

17.     Bayer AG and Bayer Corp. are jointly referred to herein as "Bayer."

18.     Covestro AG is a German corporation headquartered at Kaiser-Wilhelm-Allee 60, 51373 Leverkusen, Germany.  Covestro AG is a spin-off company from Bayer, formed in the fall of 2015, and was formerly known as Bayer MaterialScience.  Covestro AG bills itself as being "among the leading suppliers of premium polymers" and "the global leader in the development, production, and marketing of polyurethanes."  The polyurethane segment of Covestro AG's sales contributed almost $9 billion to Covestro AG's $16.3 billion in revenue.  During the Class Period, Covestro AG manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

19.     Covestro LLC is a Delaware limited liability corporation headquartered at 8500 West Bay Rd., Baytown, Texas.  Covestro LLC is a wholly-owned subsidiary of Covestro AG.  Covestro LLC claims to be a "leading producer of advanced polymers and high-performance plastics in North America and around the world."  During the Class Period, Covestro LLC manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

20.     DowDuPont Inc. is a Delaware corporation headquartered at 2030 Dow Center, Midland, Michigan.  DowDuPont was created by merger on December 9, 2015, and is comprised of the Dow Chemical Company and E.I. du Pont de Nemours and Company. During the Class Period,

DowDuPont Inc. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

21. Dow Chemical Co. is a Delaware corporation headquartered at 2030 Dow Center, Midland, Michigan. Dow Chemical Co. is a wholly-owned subsidiary of DowDuPont Inc. Dow Chemical Co. bills itself as a "leader in specialty chemicals." During the Class Period, Dow Chemical Co. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

22. DowDuPont Inc. and Dow Chemical Co. are jointly referred to herein as "Dow."

23. Huntsman Corp. is a Delaware corporation headquartered at 10003 Woodloch Forest Dr., The Woodlands, Texas. Huntsman Corp. claims to be a "a global leader in the manufacture of MDI-based polyurethanes." 53% of Huntsman Corp.'s revenue in 2017 came from the polyurethanes segment of their business, which includes Isocyanates. During the Class Period, Huntsman Corp. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

24. Huntsman International LLC is a Delaware limited liability corporation headquartered at 10003 Woodloch Forest Dr., The Woodlands, Texas. Huntsman International LLC is a wholly-owned subsidiary of Huntsman Corp. During the Class Period, Huntsman International LLC manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

25. Huntsman Corp. and Huntsman International LLC are jointly referred to herein as "Huntsman."

26. Lanxess AG is a German corporation headquartered at Kennedyplatz 1, 50679 Cologne, Germany, and is the parent company of the Lanxess Group. Lanxess AG claims to have

developed the "broadest portfolio" of Isocyanate products.  During the Class Period, Lanxess AG acquired Chemtura Corporation, formerly a major producer of Isocyanates. During the Class Period, Lanxess AG manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

27.     Lanxess Corp. is a Delaware corporation headquartered at 111 RIDC Park West Dr., Pittsburgh, Pennsylvania.  Lanxess Corp. is a wholly-owned subsidiary of Lanxess AG.  During the Class Period, Lanxess Corp. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

28.      Lanxess AG and Lanxess Corp. are collectively referred to herein as "Lanxess."

29.     Mitsui Chemicals, Inc. is a Japanese corporation headquartered at Shiodome City Center, 1-5-2 Higashi-Shimbashi, Minato-ku, Tokyo, Japan.  Mitsui Chemicals, Inc. claims to be "one of the leading manufacturers in the chemical industry."  During the Class Period, Mitsui Chemicals, Inc. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

30.     Mitsui Chemicals America, Inc. is a Delaware corporation headquartered at 800 Westchester Ave., Ste S306, Rye Brook, New York.  Mitsui Chemicals America, Inc. is wholly-owned subsidiary of Mitsui Chemicals, Inc. and operates under its parent's "global strategy."  During the Class Period, Mitsui Chemicals America, Inc. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

31.     Mitsui Chemicals & SKC Polyurethanes, Inc. ("MCNS") is a Japanese and Korean company headquartered at 17F-A, Kyobo Tower, 465, Gangnam-daero, Seocho-Gu,   Seoul, Korea. MCNS is a joint venture of Mitsui Chemicals, Inc. and SKC Co, Ltd.  MCNS describes itself as a

"global comprehensive manufacturer of polyurethane materials."  During the Class Period, MCNS manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

32.     MCNS Polyurethanes USA, Inc. is a Georgia corporation headquartered at 1 SKC Drive, Covington, Georgia.   During the Class Period, MCNS Polyurethanes USA, Inc. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

33.     Mitsui Chemicals, Inc., Mitsui Chemicals America, Inc., MCNS, and MCNS Polyurethanes USA, Inc. are jointly referred to herein as "Mitsui."

34.     Wanhua Chemical Group Co., Ltd., is a Chinese corporation headquartered at No.17, Tianshan Rd, YEDA, Yantai, 264006, China.  Wanhua Chemical Group Co., Ltd. has a significant presence in the United States.  As an example, it announced plans to build a $1.12 billion chemical manufacturing plant in Louisiana in 2017, after the state's economic development arm promised it a $4.3 million infrastructure grant.  During the Class Period, Wanhua Chemical Group Co., Ltd. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

35.     Wanhua Chemical (America) Co. Ltd. is a Nevada corporation with its principal place of business at 3803 West Chester Pike, Ste. 240, Newtown Square, Pennsylvania. Wanhua Chemical (America) Co. Ltd. is a wholly-owned subsidiary of Wanhua Chemical Group. During the Class Period, Wanhua Chemical (America) Co. Ltd. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

36.     Wanhua Chemical US Holding, Inc. is a Delaware corporation headquartered at Two Eldridge Place, 757 N. Eldridge Parkway, Suite 560, Houston, Texas.  Wanhua Chemical US

Holding, Inc. is a wholly-owned subsidiary of Wanhua Chemical Group Co., Ltd, and is its North American Regional Headquarters.  During the Class Period, Wanhua Chemical US Holding, Inc. manufactured, marketed, and sold Isocyanates in the United States, directly and through its predecessors, affiliates, parents and/or subsidiaries.

37.     Wanhua Chemical Group Co., Ltd. and Wanhua Chemical US Holding, Inc. are jointly referred to herein as "Wanhua."

## AGENTS AND CO-CONSPIRATORS

38.     Each Defendant acted as the principal of, or agent for, all other Defendants with respect to the acts, violations, and common course of conduct described in this complaint.

39.     Various other persons, firms, companies, and corporations not named as Defendants knowingly and willingly conspired with Defendants and performed acts and made statements in furtherance of the conspiracy and in furtherance of the anticompetitive conduct.

40.     The acts alleged to have been done by any Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

## INTERSTATE TRADE AND COMMERCE

41.     Defendants are the leading manufacturers of Isocyanates sold in the United States.

42.     Isocyanates are produced by Defendants or their affiliates in either the United States or overseas.

43.     During the Class Period, Defendants, directly or through one or more of their affiliates, sold Isocyanates throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial District.

44.     The activities of Defendants and their co-conspirators were within the flow of, and intended to, and did, have a substantial effect on interstate commerce in the United States.

45.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Isocyanates, took place within, and has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States and upon import commerce with foreign nations.

46.     The restraints alleged in this complaint have directly and substantially affected interstate commerce in that Defendants have deprived Plaintiff of the benefits of free and open competition in the purchase of Isocyanates within the United States.

47.     Defendants' agreement to inflate, fix, raise, maintain, or artificially stabilize prices of Isocyanates, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing Isocyanates' prices, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on United States commerce and on import trade and commerce with the United States.

## FACTUAL ALLEGATIONS

### A.    Background.

48.     Polyurethane chemistry was first pioneered by Bayer's Dr. Otto Bayer over fifty years ago.  Since then, polyurethanes have grown to become a multi-billion dollar global business.

49.     Polyurethanes are largely made from two components: polyols, which can be either polyester or polyether, and isocyanates, which include the aromatic diisocyanates MDI and TDI.

50.     Isocyanates and polyols are used to produce polyurethane products, including foams (flexible and rigid), solid polyurethanes, and CASE products (coatings, adhesives, sealants and elastomers).  These applications are used in a variety of industries, including construction, transportation, furniture, carpet cushions, appliances, packaging, bedding, truck bed lining, textiles and fibers.  Their many uses include flexible foam in upholstered furniture, rigid foam used as

insulation in walls and roofs, thermoplastic polyurethane used in medical devices and footwear, and CASE products used on floors and automotive interiors.

51.     MDI is the most produced diisocyanate, with total world production of MDI over 6 million tons per year.

52.     TDI is also produced in massive quantities, with total production exceeding 3 million tons per year.

53.     Defendants have, and had at all times throughout the Class Period, a dominant market share of this multi-billion dollar market.  In fact, Defendants openly represent themselves as global "leaders" in this respect.

**B.     Defendants Met and Conspired to Raise Prices and Control Supply.**

54.     Throughout the Class Period, the Defendants met and conspired to fix and maintain the price of Isocyanates.

55.     The majority of Defendants are members of multiple trade associations, including the American Chemistry Council ("ACC"), Center for Polyurethanes Industry ("CPI"), the Composite Panel Association ("CPA"), the European Diisocyanate & Polyol Producers Association ("ISOPA"), the International Isocyanate Institute ("III"), the Polyurethane Manufacturers Association ("PMA"), and the Spray Foam Coalition ("SFC"), among others.   These trade associations provided ample opportunities for Defendants to meet and conspire in secret.  Many of these trade associations have an extremely limited membership – for example, the ISOPA lists only six members, five of which are Defendants or Defendant subsidiaries.

56.     Upon information and belief, the conspiracy began in early 2015, when Defendants began communicating among themselves to increase prices and constrain the supply of Isocyanates. Prior to that period, pricing on Isocyanates had been stagnant, and largely dropping:



Upon information and belief, in early 2015, Defendants came to an agreement to rationalize and support increased prices for Isocyanates by intentionally curtailing supply.  Throughout the Class Period, Defendants agreed to implement, coordinate, and rotate chemical plant and factory closings, often under "force majeure" clauses that allowed them to invalidate prior purchase orders.  These closures happened under purely pretextual reasons such as supposed raw material shortages or required "maintenance."  Examples of these closings include, but are not limited to:

- On March 2, 2015, Bayer announced that it would close its MDI plant in Brazil as of July, 2015.

- That same month, on March 24, 2015 through June 1, 2015, BASF declared force majeure on production from its plant in Louisiana.

- During that same time period, in April of 2015, Huntsman shut down its plant in Holland to implement a "new operating system."

- In July of 2015, only shortly after these other closures, Bayer announced it would close its TDI plant in Brunsbuttel, Germany in September of 2015.

- Just after Bayer closed its plant in September, Mitsui announced in October of 2015 that it would shutdown its plant in Omuta, Japan in May 2016, advancing that date from a previously announced date of December 2016.

- In November of 2015, again during the same time period as all these other announcements, BASF's isocyanate plant in Louisiana announced that it would be closed for maintenance for six weeks in February of 2016.

- In December of 2015, Covestro announced that it intended to close down its plant in Terragona, Spain, by the end of 2017.  This announcement would later be rescinded in March of 2017 – when prices were much higher and when the supply of Isocyanates had been significantly reduced.

- In March of 2016, Mitsui, which had previously advanced the date of the shutdown of its Omuta plant to May, closed it down even earlier due to an "equipment defect."

- In May 2016, Covestro declared force majeure on shipments from its TDI plant in Texas.

- In June of 2016, a report stated that the BASF TDI plant in Yeosu, South Korea, was under scheduled maintenance.

- Between October and December of 2016, Covestro declared force majeure on MDI and TDI production due to supposed supply problems.  A news article reporting on this stated that the additional production shutdown "adds to a supply squeeze in the market for TDI."

- Around this same time, between September and November of 2016, Wanhua shut down its Yantai, China plant for maintenance.

- In April of 2017, Covestro declared force majeure on production in its Brunsbuttel plant due to an "unforeseeable production problem," and stated that the plant would remain closed until May 2017.

- Near that same time, Huntsman experienced supposed "technical issues" when attempting to restart its Rozenburg, Netherlands plant in May of 2017 which kept it offline.

- Again, in that same period, in May of 2017, BASF announced a force majeure on production of MDI from its Louisiana plant.  It would reiterate that force majeure as to MDI and add TDI in June of 2017.

- Also in May of 2017, Wanhua shut down its "first and second phase MDI devices" in its Ningbo factory for an "overhaul" expected to last sixteen days.

- In August of 2017, Wanhua's BorsodChem European subsidiary announced a force majeure on production of MDI from its plant in Kazincbarcika, Hungary, due to an "unforeseen technical problem at one critical raw material supplier."

- BASF declared force majeure for MDI production in its Chongquing, China plant in December of 2017 due to a supposed material supply shortage, after previously shutting down that plant for a month in March of that year;

- Wanhua again shut down its MDI production in its Ningbo factory on December 1, 2017 (for its "first phase device") and December 16, 2017 (for its "second phase device") each for 45 to 50 days for an "overhaul."

- On January 24, 2018, Dow announced force majeure on MDI production from its Texas plant due to cold weather.

- The next day, on January 25, 2018, BASF also announced a force majeure on MDI production from its United States plant, and followed that with an announcement of force majeure on United States production of TDI on January 31, 2018. An article reporting on these closures noted that "US buyers had been hoping to see stable pricing, or possibly even some price relief, on MDI at the start of the year following the significant run-up in prices that occurred in 2017 owing to persistently tight supply. However, with supply disruptions impacting a significant portion of US MDI capacity, prices are likely to remain steady or even move higher over the short term."

57.     Perhaps the best example of Defendants' pretextual plant closures and supply constraints is BASF's Ludwigshafen, Germany plant. Construction on that plant was started prior to the Class Period, and BASF had no choice but to open it on November 17, 2015. But, as one report noted, it hardly progressed beyond a brief "trial operation period," with technical delays causing delays and shutdowns. As of November of 2016, the entire plant was taken offline due to a "technical defect," and it would remain closed for months. In March of 2017, BASF announced that it would finally restart the plant "in a few weeks" after replacement of a damaged reactor. In May of 2017, BASF finally stated that the repair was completed but it was still doing "test runs" on the new reactor. BASF then got the plant up and running again in late May 2017, but announced that it would be running at "reduced output" due to the newly-installed reactor being smaller than the original one, with delivery of another new reactor scheduled for the following year. Then, in October of 2017, BASF stated that it identified "quality differences" from the Ludwigshafen plant and not only stopped TDI production again, but also instituted a recall of shipped TDI. In January 2018, BASF announced that it had shut down Ludwigshafen completely and would resume it "in the

course" of the second quarter.  In short, after opening its new plant near the beginning of the Class Period, BASF managed to keep that plant from running in any significant manner.

58.     The supply of Isocyantes is generally considered in global terms.  Shutdowns of plants outside the United States can and do affect the supply of Isocyanates available in the United States and, accordingly, the price.  For example, in an investor call in July of 2016, Huntsman's CEO, Peter Huntsman, discussed the topic of MDI supply/demand balance and emphasized that he was talking about global capacity being utilized in the 80-90% range, and stated that meant they were "going to have opportunities to expand further [profit] margins, and so forth as we go throughout the year."   When asked if he expected to see greater pressure from competitors due to dropping raw material costs, Mr. Huntsman responded, "Not really.  We're looking at capacities in Europe and the Americas in the mid 90%s.  I don't see that the market is sloppy enough to be giving away raw material fluctuations and so forth. So, no, I don't see that at this point."

59.     Defendants also buy Isocyanates from one another in times of tight supply, and thus an outage at one Defendant affects the supply from purchases of other Defendants.  For example, in June of 2016, a news report stated that Wanhua's supply of TDI was tight because it was selling to BASF and Mitsui during the shutdowns due to "malfunctions" at their plants.  Similarly, in April of 2017, Peter Huntsman confirmed on an investors' call that Huntsman was buying product from its competitors while Huntsman had a new facility coming online.  Purchasing Isocyanates from one another also allowed Defendants to further collaborate and police their pricing agreements.

60.     The massive amount of plant closures described above is not typical or standard in the Isocyanates industry.  Market reports noted the uncertain nature of these outages and their impact on Isocyanates' prices.  One report stated in September of 2017 that the MDI market was "plagued by a series of planned and unplanned outages, as well as production disruptions, which have significantly

tightened the global landscape and resulted in significant price increases globally." That same report noted that "what has caught most market players off-guard is the length and severity of the supply tightness" and that supply was expected to remain tight, with price increases still likely despite "significant increases" already happening that year.

61.     Another report in June of 2017 noted that force majeure declarations and production issues in the Isocyanates market had left participants "lamenting a lack of product" and that many sources stated they were "unable to operate as they usually would due to resultant price rises," citing several of the above closures.

62.     A market report in January of 2018 noted that executives from both Dow and Covestro claimed that demand growth had "outpaced industry anticipations" and that the "isocyanate industry has struggled to bring new capacity on-line quickly enough to meet the additional demand." That report also stated that "With the market facing persistent supply shortages and demand growing at a faster than expected clip, isocyanate buyers had little alternative but to accept consecutive rounds of price increases, with some sellers heard to have taken a 'take it or leave it' attitude towards their price increase initiatives, which would normally be at least partially negotiable." In short, Defendants' control and limitation of the Isocyanates supply allowed them to implement price increases with no danger of any push back from Isocyanates purchasers.

**C.      Defendants Coordinated Their Price Increases.**

63.     Defendants' conspiracy, including the above-described supply constraints, allowed them to implement price increases on Isocyanates in unison.

64.     Price increase announcements from Defendants show a distinct pattern of near-simultaneous increases on Isocyanates:

- Between March 17-30, 2016, Dow, BASF, and Wanhua all announced price increases on MDI and TDI, all effective on the same day.

- Between May 13-16, 2016, Dow, BASF, and Wanhua all announced price increases on TDI.

- Between October 7-13, 2016 Dow, BASF, and Wanhua all announced price increases on TDI.

- Between December 9-19, 2017, Dow, BASF, and Wanhua all announced price increases on MDI, with both BASF and Wanhua announcing on the same day.

- Between January 13-23, 2017, Dow, BASF, and Wanhua all announced price increases on TDI, with Dow and Wanhua announcing on the same day.

- On March 20, 2017, BASF announced a price increase on MDI and TDI, followed on March 21 by an increase on MDI by Dow.  Wanhua had previously announced an increase in MDI in January of 2017, which was effective that same month, on March 1, 2017.  Dow supplemented this with another MDI increase on April 3, 2017.

- Between April 27-May 10, 2017, BASF and Wanhua announced price increases on MDI and TDI, and Dow announced a price increase on MDI.

- Between June 15-19, 2017, BASF and Wanhua both announced price increases on TDI.

- Between August 4-17, 2017, Dow, BASF, and Wanhua all announced price increases on TDI.  Dow and Wanhua also announced increases on MDI in August, with BASF announcing later on in September.

- Between September 19-22, 2017, BASF and Dow both announced increases on TDI, with Wanhua announcing later in November.

- Between December 4-12, 2017 BASF and Dow both announced increases on MDI.

- Between January 15-24, BASF and Wanhua both announced increases on TDI.

- Between February 5-9, 2018, Dow and Wanhua both announced increases on TDI.

65.     Upon information and belief, the above increases are too numerous and too closely connected in time to be mere parallel conduct; they had to be coordinated and agreed-upon by Defendants.  Announcements made on the same day, moreover, cannot be merely follow-the-leader parallel conduct.

66.     Other industry reports describe coordinated price increases by all Defendants.  For example, an industry source noted that there was a general market price increase in November of 2017, and that "customers have not fought it."

67.     The effect of this conspiracy, in general, was sharply rising prices, starting largely in early 2016 as the supply reductions began to take effect, and continuing until the end of the Class Period.  A graph of pricing throughout 2017 shows the continual and dramatic rise of prices for Isocyanates by as much as 35% for TDI and over 25% for MDI over a single year:



68.     In February of 2017, a Chinese financial institution, in considering Wanhua's financial results, stated that "The MDI Market is expected to stay at high levels in the future because some plants reduce operation under the circumstance of equipment maintenance, resulting in tight supply.  Due to good competition pattern and prospect of development, the company will hopefully keep the profits."

69.     All of the Defendants reported strong, often record-breaking, profits for Isocyanates during the Class Period.  As an example, Covestro stated on February 20, 2018, that its improved cash flow was "above expectations, underpinning management's confidence that the high margin levels will not materially reverse in the coming years."  Huntsman, in the later part of the Class Period, continually expressed that global capacity utilization of Isocyanates was at 95% and that margins would remain strong even with dropping raw material prices.  On a February 2018 investors' call, BASF stated that sales of its monomer products had "increased considerably" and that "[s]ignificantly higher prices, especially for MDI and TDI, drove this growth."

## D.     **Department of Justice Investigation.**

70.     On June 8, 2018, news publication Mlex reported that Isocyanates producers were the targets of a DOJ criminal price-fixing investigation. As part of that report, Covestro confirmed that it had been contacted by the DOJ regarding its investigation, and that it would cooperate with the authorities.  The report stated that the targeted companies had received grand jury subpoenas during the last week of February 2018.

71.     In a subsequent report, on June 11, 2018, BASF confirmed that it had also received a subpoena from the DOJ, along with "several other companies," related to an investigation into MDI and alleged violation of antitrust laws.

72.     It is significant that Defendants' anticompetitive behavior is the subject of a criminal grand jury investigation being conducted by the DOJ. In order for the DOJ to institute a grand jury

investigation, a DOJ Antitrust Division attorney must believe that a crime has been committed and prepare a detailed memorandum to that effect.  Following a review of that memorandum, the request for grand a jury must be approved by the Assistant Attorney General for the Antitrust Division, based on the standard that a criminal violation may have occurred. In addition, the fact that the DOJ Antirust Division investigation is criminal, as opposed to civil, is significant as well. The Antitrust Division's "Standards for Determining Whether to Proceed by Civil or Criminal Investigation" state: "[i]n general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations."

73.    Defendants are recidivist violators of the antitrust laws that have communicated and fixed prices in this same industry in the past.  All of the Defendants or their predecessors, with the exception of Wanhua and Mitsui, were the subject of prior governmental investigations and civil lawsuits regarding price-fixing of polyester and polyether urethanes, the end product which Isocyanates are an input for, between 1995 and 2009.  Those lawsuits resulted in more than a billion dollars of civil settlements, including a $1.1 billion jury verdict against Dow which was ultimately settled for $835 million prior to appeal to the Supreme Court.  *See In re Urethane Antitrust Litig.*, Case No. 04-md-01616 (D. Kan).  A prior criminal investigation into price-fixing of polyester polyols let to a conviction of Bayer Corporation, and a fine of $33 million.

## E.    The Isocyanates Market is Conductive to Price Fixing.

74.    The Isocyanates market demonstrates all the characteristics of a market that was ripe for collusive activity.

75.    Isocyanates are highly commodified products.  Isocyanates are a chemical compound, and any manufacturer's Isocyanates could be substituted for another.

76.    Because of the commodity nature of this product, price increases would be difficult to institute and maintain without collusion.  In a competitive market, price increases could be quickly undercut by competitors who have comparable and easily-interchangeable chemicals.

77.    The Isocyanates market is also highly concentrated.  Defendants have a dominant global market share, and collusion among them quickly resulted in a dramatic rise in prices.  It is estimated that Defendants collectively control more than 90% of the global production of Isocyanates.

78.    There are significant barriers to entry in the Isocyanates market.  Isocyanates production requires sophisticated, expensive chemical plants.  Building factories to create products such as Isocyanates requires a significant outlay of financial capital and the acquisition of personnel with substantial technical expertise.  As an example, Wanhua announced plans to build a chemical manufacturing plant in Louisiana in 2017, and that single plant alone was expected to cost $1.12 billion.

79.    Moreover, as previously stated, the market was dominated throughout the Class Period by the Defendants – large, established companies that have the resources to benefit from economies of scale and that have established their reliability regarding the manufacture of this chemical.  A prospective entrant into the industry would have to invest an enormous amount of money, and would face a long period of time before it could establish a customer base sufficient to gain any return on its investment.

80.    In fact, during the Class Period, there were no significant new entrants into the Isocyanates market, and any apparent new entrants were only the result of company spin-offs, such as Bayer creating Covestro, or industry consolidation, such as Lanxess' acquisition of former

Isocyanates producer Chemtura Corporation. Accordingly, Defendants could be confident that, working together, they could use their dominant market share to control prices in the industry.

81.     There is also inelasticity of demand in the Isocyanates market. There is no real substitute for Isocyanates, and it is a necessary component to the production of polyurethane products.

82.     In general, an industry with such inelastic demand is more susceptible to price fixing. Demand will not decline even in the face of increased prices, and thus price-fixing conspiracies can raise and maintain pricing without losing sales.

83.     All of these market factors contributed to the effect of Defendant's price-fixing scheme: higher prices that purchasers, such as Plaintiff, were forced to pay.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

84.     Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful conduct from discovery by Plaintiff.

85.     During the Class Period, Defendants provided purchasers and the public with pretextual excuses for pricing increases, output levels, and supply constraints. Defendants' pretextual justifications were intended to and did mislead purchasers.

86.     For example, certain Defendants attempted during the Class Period to falsely attribute price increases of Isocyanates purchased by Plaintiff to supply constraints when supply was, in fact, purposefully limited by the Defendants, including through plant closures and shutdowns that were falsely represented as necessary.

87.     Upon information and belief, Defendants did not create, maintain, or distribute official records of the cartel meetings they held and attended in furtherance of the conspiracy, so as to maintain the secrecy of the conspiratorial conduct and of the conspiracy itself.

88.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, which it, in fact, exercised, the existence of the conspiracy and Defendants' and their co-conspirators' involvement in the conspiracy until June 8, 2018, when the DOJ's investigations first became public.

89.     Because the conspiracy was actively concealed until June 8, 2018, Plaintiff was unaware of Defendants' unlawful conduct, and did not know that it was paying artificially high prices for Isocyanates.

90.     The affirmative acts of Defendants, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

91.     Defendants agreed among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

92.     Defendants met and communicated secretly concerning the pricing and marketing of Isocyanates as to avoid detection.

93.     Plaintiff could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and secrecy techniques employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy, or combination. Defendants' conspiracy was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, including meetings at trade associations, misrepresentations to customers, and surreptitious communications among Defendants in order to prevent the existence of written records.

94.     Because the alleged conspiracy was affirmatively concealed by Defendants and their co-conspirators until June 8, 2018, Plaintiff had no knowledge of the alleged conspiracy or any facts

or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

95.      None of the facts or information available to Plaintiff prior to June 8, 2018, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy.

## CLASS ACTION ALLEGATIONS

96.      Plaintiff brings this action on its own behalf and as a class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class (the "Class"):

> All persons and entities that directly purchased Isocyanates within the United States, its territories and the District of Columbia from any Defendant or any predecessor, subsidiary or affiliate thereof, at any time between January 1, 2015 through the present. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, and Defendants' officers, directors, employees, and immediate families.

Plaintiff does not know the exact number of members of the Class because such information is in the exclusive control of Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States, its territories and the District of Columbia so that joinder of all Class members is impracticable.

There are questions of law and fact which are common to the claims of Plaintiff and the Class, including, but not limited to:

a.      Whether Defendants engaged in a combination or conspiracy with their co-conspirators to fix, raise, maintain, and/or stabilize the prices for Isocyanates;

b.      Whether the purpose and/or effect of the acts and omissions alleged herein was to restrain trade, or to affect, fix, control, and/or maintain the prices for Isocyanates;

c.      The existence and duration of the horizontal agreements alleged herein to fix, raise, maintain, and/or stabilize the prices for Isocyanates;

d.      Whether Defendants violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

e.      Whether Defendants' agents, officers, employees, or representatives participated in correspondence and meetings in furtherance of the illegal conspiracy alleged herein, and, if so, whether such agents, officers, employees, or representatives were acting within the scope of their authority and in furtherance of Defendants' business interests;

f.      Whether, and to what extent, the conduct of Defendants caused injury to Plaintiff and members of the Class, and, if so, the appropriate measure of damages; and

g.      Whether Plaintiff and members of the Class are entitled to injunctive relief to prevent the continuation or furtherance of the violation of Sections 1 and 3 of the Sherman Act.

97.      Plaintiff's claims are typical of the claims of the members of the Class.

98.      Plaintiff will fairly and adequately assert and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class.

99.      Plaintiff is represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

100.      The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

101.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

b.      The Class is readily definable and one for which records should exist in the files of Defendants.

c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

d.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.

e.      Class treatment will permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint on an individual basis.

102.    This class action presents no difficulties of management that would preclude its maintenance as a class action.

## COUNT I

## VIOLATION OF THE SHERMAN ACT §§ 1, 3

103.    Plaintiff incorporates all allegations alleged herein.

104.    Defendants and their co-conspirators entered into, and engaged in, a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, 3.

105.    Defendants' anticompetitive acts were intentionally directed at the United States Isocyanates market, and had a substantial and foreseeable effect on interstate commerce by raising and fixing Isocyanates' prices throughout the United States.

106.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects upon commerce in the United States and upon import commerce:

a.   Prices charged to, and paid by, Plaintiff and members of the Class for Isocyanates were artificially raised, fixed, maintained, or stabilized at supra-competitive levels;

b.   Plaintiff and members of the Class were deprived of the benefits of free, open, and unrestricted competition in the United States Isocyanates market; and

c.   Competition in establishing the prices paid for Isocyanates has been unlawfully restrained, suppressed, or eliminated.

107.   Defendants' and their co-conspirators' anticompetitive activities have directly and proximately caused injury to Plaintiff and members of the Class in the United States.

108.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class paid artificially inflated prices for Isocyanates.

109.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class were damaged in their business or property by paying prices for Isocyanates that were higher than they would have been but for Defendants' unlawful conduct, which has resulted in an amount of ascertainable damages to be established at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

A.   That the Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.   Adjudge and decree that Defendants' unlawful contract, combination, or conspiracy constitutes a *per se* violation of Sections 1 and 3 of the Sherman Act;

C.      Adjudge and decree that each Defendant, and its successors, assigns, parents, subsidiaries, affiliates, and transferees, and their respective officers, directors, agents, and employees, and all other persons acting or claiming to act on behalf of any of them or in concert with them, be permanently enjoined and restrained from in any manner, directly or indirectly, continuing, maintaining, or renewing the combination, conspiracy, agreement, understanding, or concert of action, or adopting any practice, plan, program, or design having a similar purpose or effect in restraining competition in the United States Isocyanates market;

D.      Enter judgment against Defendants, jointly and severally, in favor of Plaintiff and the Class for treble damages determined to have been sustained by Plaintiff and the Class by virtue of Defendants' and their co-conspirators' violations of the Sherman Act;

E.      Award Plaintiff and the Class their attorneys' fees, litigation expenses, and court costs, as well as pre-judgment and post-judgment interest as permitted by United States law; and

F.      Grant Plaintiff and the Class such other and further relief as the case may require, or as the Court deems just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury.

Dated:  July 6, 2018

*/s/ Peter S. Pearlman*
Peter S. Pearlman
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600
Facsimile:  (201) 845-9423
psp@njlawfirm.com

Jason S. Hartley
HARTLEY LLP
500 West C Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 400-5822
Facsimile: (619) 400 5832
hartley@hartleyllp.com

Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: ecramer@bm.net

Daniel J. Walker
BERGER & MONTAGUE, P.C.
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
Facsimile: (215) 875-4604
Email: dwalker@bm.net

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
vesades@heinsmills.com

Daniel R. Karon
KARON LLC
700 W. St. Clair Ave, Ste 200
Cleveland, OH 44113
Telephone: (216) 622-1851
dkaron@karonllc.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR DAMAGES